IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| KATHERINE LEACH, GARRY K. LEACH, MARK BROWDER, TERRI BROWDER on behalf of themselves and those Similarly situated | ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. NO. 4:24-cv-00885-ALM |
| VS. | ) ) | **JURY DEMANDED** |
| GATEWAY CHURCH, ROBERT MORRIS, THOMAS M. LANE, KEVIN L. GROVE, STEVE DULIN, | ) ) ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT**

Plaintiffs Katherine Leach, Garry K. Leach ("Leach"), Mark Browder, Terri Browder ("Browder") (collectively "Plaintiffs") bring this action individually and as a putative class action on behalf of themselves and all others similarly situated. Plaintiffs, by and through their undersigned attorneys, hereby state:

**I.**

**JURISDICTION AND VENUE**

1.     This Court has subject matter jurisdiction of this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), as codified at 28 U.S.C. §§ 1332(d), 1453, and 1711-15, and under 28 U.S.C. §§ 1331, 1348, 1367 and 1441.

2.     The proposed class contains well in excess of 100 members for purposes of CAFA. *DT APARTMENT GROUP, LP and Richard Aguilar, Plaintiffs, v. CWCAPITAL, LLC; Cwcapital Mortgage Securities I, LLC; Cwcapital Asset Management LLC; and US Bank, N.A., as successor to Wells Fargo Bank, N.A., as Indenture Trustee, Defendants*, 2012 WL 425337 (N.D.Tex.).

3.      Gateway is one of the largest churches in the United States with current and past membership exceeding 100,000 congregants.  Accordingly, the likely putative class will be tens of thousands of persons and the damages will far exceed Five Million Dollars.

4.      The putative class members will likely include members from states throughout the United States including Wyoming, where Gateway has a location, St. Louis, where Gateway has a location.

5.      Further, Gateway has a large online presence and following throughout the United States.

6.      Jurisdiction is proper under the Class Action Fairness Act because there are over 100 likely putative class members, damages exceed Five Million Dollars, and there are class members from states other than Texas.

7.      While the class representative Plaintiffs have not donated or seek reimbursement of Five Million Dollars, the putative class damages far exceed Five Million Dollars.

8.      Venue is proper in this district because Gateway maintains at least three large locations in Frisco, Prosper, and Plano, all of which fall within the Eastern District of Texas.  Venue is further proper because some of the named class members and thousands of the putative class members, tithed from and attended Gateway churches within this district and division.

## II.

### SUMMARY

9.      This lawsuit is about transparency and promises, brought by members whose concern is not money in their pockets but rather exposing fraudulent stewardship. Then-Senior Pastor Robert Morris and Gateway leaders represented that 15% of all tithe dollars would be distributed to global missions and Jewish ministry partners, encouraging church members to

generously give toward these ends. On the account of the facts set forth herein, Plaintiffs allege that Gateway Church and its leaders engaged in misrepresentation, fraud, and breach of contract in their efforts to induce Plaintiffs and other church members to donate money to Gateway.  On information and belief, Defendants did not use 15% of all money donated for the intended purpose as represented by Robert Morris and Gateway leaders.  Attempts to seek transparency and proof that money did in fact go to global missions and Jewish ministry partners have been rebuffed by Gateway elders.  On information and belief, Robert Morris, Thomas M. Lane, Kevin L. Grove, and Steve Dulin, with the knowledge and consent of Gateway elders, have diverted money from global missions and Jewish ministry partners to "secret organizations."  This lawsuit is a means of last resort and being pursued with a heavy heart.

10.     Further, the Church, and Morris specifically, used a marketing scheme to guarantee congregants a return of their money if the congregants wanted such a return.  However, when congregants asked the Church to make good on such promise, the Church refused.  In response to request for the return of congregant tithes, Gateway's counsel, Wendi Hodges, recently responded "… once donations are made, they constitute a completed, unconditional gift to the Church and become the property of the Church."   This position is contrary to Defendants' repeated representations to congregants.

### III.

### INTRODUCTION AND FACTUAL BACKGROUD

11.      Gateway Church ("**Gateway**" or the "**Church**") is a non-denominational church with multiple locations where members/congregants can attend church in person.

12.     Additionally, Gateway has a large online streaming presence for its member/congregants/visitors.

13.     At its peak, Gateway is believed to have over 100,000 members.

14.     Gateway is known as a megachurch and at its peak was one of the largest churches in the United States.

15.     Gateway's members and other attendees have supported Gateway for over two decades with their faithful acts of tithing.

16.     Tithing is a predominant subject at Gateway and is the subject of and discussed during MANY sermons and other mediums.

17.     Gateway uses a myriad of marketing strategies to raise tithes.

18.     Two such marketing strategies are:

   a)     15% of all tithes go to Global Ministries;
   b)     Tithers can get their money back, as discussed below.

19.     Robert Morris, founding and former Senior Pastor, and other Gateway leaders told the congregation for years that 15% of all tithe dollars went to global missions work via Gateway Global Ministries, an amount documented in the Members' Handbook given to new members.

20.     Encouragingly for tithing members, the Church was allegedly sending at least $20 million overseas each year. Robert Morris stated in 2023 that "about ten years ago we passed, in our missions giving, $20 million a year . . . but now it's over $25 million."[1] Morris, explaining his church's philosophy of giving "to the Jew first",[2] promised that of the tithing dollars funneled to missions, the first 10% went to "Jewish ministries" (and sometimes more than that, up to $5 million per year to Jewish ministries).

---

[1] Tikkun Global, *Tikkun Global Conference 2023 | Robert Morris*, YouTube (Sept. 11, 2023), https://www.youtube.com/watch?v=jh0NWp0xQ1s.
[2] In Romans 1:16, the Apostle Paul wrote, "For I am not ashamed of the gospel, for it is the power of God for salvation to everyone who believes*, to the Jew first* and also to the Greek" (emphasis added). Morris has often used this language as the basis of Gateway's missions approach. The Church also holds a regular Shabbat service in honor of the Jewish Sabbath.

21.     Today, the Gateway site states that "The first 15% of Gateway's tithe is set aside to support local, national, and international outreach efforts. Your generosity helps provide resources for ministry partners and people in need around the world."

22.     Morris's statements on the global missions budget represent that over $100 million in annual tithing dollars a decade ago, which lines up with the wealth of the church on a broader scale in annual financial reports.

23.     To oversee the operations of Gateway Global Ministries, Gateway hired a seasoned CPA and then-partner at a well-known international accounting firm.  That CPA was told that Gateway could really use his heart for missions to oversee with integrity the more-than-$10 million per year that Gateway was allegedly giving away.

24.     The CPA joined Gateway as Executive Pastor of Global Ministries in July 2011—not as an accountant.

25.     The CPA, who supervised six associate pastors, was in charge of vetting and approving relationships with and gifts to ministry partners around the world.

26.     Each month, the CPA would receive a financial statement for the Global Ministries fund, which reflected increases (15% of the tithe) and outflow (salaries, administrative costs, and approved gifts to ministries).  At the end of each year, the CPA and his administrative assistant would review the transactions for the year.

27.     When the CPA first began working for Gateway, its annual revenue was in the $100 million range and rose to about $120 million by 2014.  However, during the CPA's tenure in his executive pastoral role, he never observed the Global Ministries fund give away more than $3 million in any year.

28.     As quoted above, in around 2013 the giving to missions had reached an estimated

$20 million per year. Thus, depending on the year and the tithing, that meant that the unspent

global fund balance was growing at approximately $10 million per year.  In spite of that, Robert

Morris and other leaders at Gateway, including defendants Thomas Lane, Kevin Grove and Steve

Dulin, misled the congregation during Global Impact Weekend each year by stating that the full

amount was being given to missions when, in fact, it was not.

29.     A member of the Global staff detected discrepancies in the reconciliation of the

Gateway's Global Ministries fund balance.  Noticeably, several entries, amounting to more than

$1 million, were unaccounted for.  The CPA asked Randy Bell, Gateway's CFO, about this issue;

Bell stated he did not know what the entries represented but that they were "elder approved."  The

CPA asked which elders approved them, but Randy Bell did not know, stating instead that it came

from Kevin Grove.  To this day, Grove is listed on the Gateway site as executive global pastor and

an elder of the Church.

30.     The financial irregularities observed by the CPA occurred outside the scope and

purview of any external accounting reports and thus escaped external scrutiny.   Based on

information and belief, no financial auditing was done by an outside accounting firm during this

time period related to the Global Ministry donations.

31.     The CPA scheduled a meeting with Kevin Grove the following day and approached

him with the reconciliation errors.  Kevin Grove became visibly enraged and, with a raised voice,

instructed the CPA to "quit reconciling the accounts."   Around this time period, the CPA began to

find similar unexplained entries.

32.     The CPA presented his concerns to Tom Lane, telling him that he couldn't be part

of the financial irregularities and that it needed to be addressed, or he would resign.  Tom Lane

told the CPA that he would take up the concerns with Robert Morris, the then-Senior Pastor.  A few days later, Tom Lane told the CPA, "I spoke to Robert over the weekend, and we agreed to accept your resignation."  Rather than practice transparent stewardship with one of its key pastors, who was hired to lead the directly relevant global ministry, the Church ignored and buried his concerns.

33.     In the CPA's exit interview, Tom Lane told him about fraud against Gateway that occurred when an organization called the West Africa Initiative (WAI) defrauded the Church in the amount of $750,000.  The CPA's research unveiled that several Gateway leaders, including Kevin Grove, Ernest Reed Grafke, and Peter Hirsch, may have been on the WAI Board of Directors.  If an audit had truly been performed, it would have uncovered Gateway's engagement with the WAI for supposed ministry project.

34.     Following turmoil and disappointment in the Church following Morris's resignation (as a result of sexual assault allegations made public in the summer of 2024), current members, sought transparency regarding the use of tithing money.

35.     The members inquired with the church leadership, and because members cannot be fired, the Church seemingly did not know what to do.  Gateway refused to be transparent when trying to answer even simple questions about the use of tithing dollars.

36.     Defendants' refusal to answer even the most basic of questions is one of the reasons for this lawsuit.  Plaintiffs seek transparency and an explanation of what happened to the 15% of funds collected that Robert Morris, Tom Lane, and the other named Defendants promised would be used for global missions.  If it turns out that Defendants have not used the money as represented, as is suggested by credible allegations, then the purpose behind this lawsuit is to return the money to the tithers so that they may give as originally intended. Recently, Gateway's elder, Tra Wilbanks,

told congregants that Gateway has audited financials going back as far as twenty (20) years. Plaintiffs' counsel has requested a copy of the audited financials from Gateway's counsel, Ronald Breaux, but no such audited financials have been forthcoming.

37.     In addition to promising to give 15% to global missions, Robert Morris and Tom Lane promised on multiple occasions that if the congregation is not happy with the use of its money, it can get the money back.  Specifically, by one example, Robert Morris stated:

> I've told our church on multiple occasions, I've said to them . . . If you'll try it for one year—if you are not fully satisfied—at the end of that year, I'll give you your money back. With twenty-two years of church, no one has ever asked for their money back.

38.     This statement was repeated by Defendants Tom Lane, Kevin Grove, Steve Dulin, all the while knowing that the representation was false and made with the intention of inducing congregants to give money.

39.     Many people have requested a refund of their tithes only to be stonewalled and ignored by the Defendants at first.

40.     Recently, when asked for the return of their tithes, as promised by Morris, counsel for the Plaintiffs was told:

> The Church's general position is that it is impermissible for the Church to refund or return donations.  In short, once donations are made, they constitute a completed, unconditional gift to the Church and become the property of the Church.  To give any private individual money or property of the Church, even if described as a "return of donation" would constitute inurement or private benefit in violation of federal law.
>
> Unlike a deposit in a bank, donated funds are not kept on account for the donor but, when received, immediately made part of other donated funds and used for the church's many charitable purposes.  Refunds are not a charitable purpose.

41.     Thus, despite Mr. Morris' time and time again promise to refund monies, the Church now says such a return is either not lawful or not permitted under the Church rules, thereby making Morris' promise a negligent or intentional misrepresentation to the tithers.

42.     Some Gateway congregants also have concerns regarding disaster-designated offerings and whether these funds reached their assigned destination. Congregants donated to Gateway's disaster relief program to help people in desperate need. When a congregant asked Gateway what financial reports were available for review, the congregant was directed to a 90-second "highlight reel" of the Gateway program. When similar requests were made multiple times to other Gateway pastors and staff members, the congregant never received the assured follow-up communications regarding these donations.

## IV.

## PARTIES

43.     Plaintiff Katherine Leach is an individual residing in Collin County, Texas.

44.     Plaintiff Garry K. Leach is an individual residing in Collin County, Texas.

45.     Plaintiff Mark Browder is an individual residing in Tarrant County, Texas.

46.     Plaintiff Terri Browder is an individual residing in Tarrant County, Texas.

47.     Defendant Gateway Church is a nonprofit corporation organized under the laws of the State of Texas with its principal place of business in Southlake, Texas. Defendant Gateway may be served through its registered agent for service of process, David O. Middlebrook, Middlerook Group, PLLC, 611 S. Main Street, Suite 500, Grapevine, Texas 76051.

48.     Defendant Robert Morris is an individual residing in Tarrant County, Texas, and may be served with process at 2121 Southlake Blvd., Southlake, Texas 76092.

49.     Defendant Thomas M. Lane is an individual residing in Tarrant County, Texas, and may be served with process at 2121 Southlake Blvd., Southlake, Texas 76092.

50.     Defendant Kevin L. Grove is an individual residing in Tarrant County, Texas, and may be served with process at 500 S. Nolen, Suite 300, Southlake, Texas 76092.

51.     Defendant Steve Dulin is an individual residing in Tarrant County, Texas, and may

be served with process at 2121 Southlake Blvd., Southlake, Texas 76092.

52.     Upon information and belief, the individual Defendants currently or formerly led

Gateway Church and had control of the decision-making over the issues in this lawsuit.

**V.**

**CLASS ACTION ALLEGATIONS**

53.     Plaintiffs bring this action as a class action under Federal Rule of Civil Procedure

23, on behalf of themselves and all others similarly situated.

54.     Plaintiffs seek to represent a Rule 23(b) (3) class initially defined as:

a)      All persons who donated money to Gateway Church in reliance upon the 15%
        promise for the funds to go to Global Mission Work

b)      All persons who want their money back pursuant to the guarantee of Gateway and
        Robert Morris

55.     Plaintiffs reserve the right to amend the definition of the Class if discovery or

further investigation reveals that the Class should be expanded or otherwise modified.

**Numerosity and Ascertainability**

56.     This action satisfies the requirements of Rule 23. Plaintiffs are informed and believe

there are thousands of persons who qualify under this Class definitions.

57.     Each of the Classes is ascertainable because its members can be readily identified

using easily discoverable information. Plaintiffs anticipate providing appropriate notice to each

certified Class, in compliance with Rule 23to be approved by the Court after class certification.

**Predominance and Commonality**

58.     This action satisfies the requirements of Rule 23 because questions of law and fact

that have common answers predominate over questions affecting only individual Class Members.

These include, without limitation, the following:

a.      Whether Gateway utilized the 15% funds as publicly promised to entice more tithing.

b.      Whether Gateway has or will refund monies to dissatisfied members as promised.

c.      To what extent the members of the Class have sustained damages and the proper measure of damages.

## Typicality

59.     This action satisfies the requirements of Rule 23 because Plaintiffs' claims are typical of the claims of the Class members and arise from the same course of conduct by Gateway.

## Adequate Representation

60.     Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel with substantial experience in prosecuting complex class actions.

61.     Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests adverse to those of the Class.

## Superiority

62.     This action satisfies the requirements of Rule 23 because the class action is superior to other available methods of fair and efficient adjudication of this controversy. The common questions of law and fact regarding Gateway's conduct and responsibility predominate over any questions affecting only individual Class members.

63.     The burden imposed on the judicial system by individual litigation by even a small fraction of the Class would be extensive, making class adjudication the superior alternative under Federal Rule of Civil Procedure 23.

64.     The conduct of this action as a class action presents far fewer management difficulties, far better conserves judicial resources and the parties' resources, and far more effectively protects the rights of each Class member than would piecemeal litigation. Compared to

the expense, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation, the challenge of managing this action as a class action are substantially outweighed by the benefits to the legitimate interests of the parties, the court, and the public of class treatment in this court making class adjudication superior to other alternatives, under Federal Rule of Civil Procedure 23.

65.     Plaintiffs are not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Federal Rule of Civil Procedure 23 provides the Court with authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges. The Court may, on motion of Plaintiffs or on its own determination, certify classes for claims sharing common legal questions; utilize the provisions of Federal Rule of Civil Procedure 23 to certify any particular claims, issues, or common questions of law or fact for class- wide adjudication; certify and adjudicate bellwether class claims; and utilize Federal Rule of Civil Procedure 23 to divide any Class into subclasses.

66.     The undersigned counsel for Plaintiffs and the Class request that this Court appoint them to serve as Class counsel; first on an interim basis and then on a permanent basis pursuant to Federal Rule of Civil Procedure 23.  Undersigned counsel will fairly and adequately represent the interests of the Class, have identified or investigated the Class's potential claims, are experienced in handling class actions, other complex litigation, and contract claims of the type asserted in this action, know the applicable law, will commit sufficient resources to represent the class, and are best able to represent the Class.

**VI.**

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**

**Misrepresentation and Fraud (and conspiracy between all Defendants)**

67.     Plaintiffs incorporate by reference the allegations made in the preceding paragraphs as if fully set forth herein.

68.     In reliance upon the many promises by Senior Pastor Robert Morris, Thomas M. Lane, Kevin L. Grove, Steve Dulin and the Church, that 15% of church tithing dollars would go to international missions and Jewish ministries, the Plaintiffs and Plaintiff class members donated money.

69.     Plaintiffs have requested verification regarding the use of those funds and whether it complies with the 15% tithing distribution procedure as provided by Gateway leaders.  Gateway has not responded to requests for copies of its alleged audited financials for the past twenty (20) years.

70.     Upon information and belief, and based on accounting professionals previously with Gateway, those funds were not used as promised and as relied upon by Plaintiffs. Defendants conspired with one another to misrepresent facts and defraud Plaintiffs regarding the use of tithe dollars for global missions and Jewish ministries in order to induce Plaintiffs' tithing to the Church.

71.     Further, Gateway represented to tithers that tithers could receive a return of their tithes for any reason.

72.     According to counsel for Gateway, the return of tithes is not permitted by either the Church policies or by law meaning that when the Church made the promise to the

congregants/tithers, the Church either knew or should have known the promise to return was false or never intended to return any tithe dollars.

73.     Plaintiffs have been damaged as a direct and proximate result of Gateway's fraud upon the Class.

**SECOND CLAIM FOR RELIEF**

**Breach of Contract and Conspiracy to Breach Contract Against all Defendants**

74.     Plaintiffs incorporate by reference the allegations made in the preceding paragraphs as if fully set forth herein.

75.     Plaintiffs and Gateway entered into valid and enforceable agreements, wherein Gateway agreed to give requesting tithers their money back.

76.     Plaintiffs fulfilled their contractual obligations under their agreements with Gateway by tithing to Gateway.

77.     Gateway breached this agreement by not returning these funds to requesting members/tithers.

78.     Further, Plaintiffs had an enforceable contract for their tithing based upon their commitment in exchange for a promise that 15% would be used for global missions and Jewish ministries.

79.     In other words, the members/Plaintiffs agreed to tithe in exchange for the promise that at least 15% of those monies would go to international mission efforts and Jewish ministries and that the church would not engage in fraudulent misrepresentation.

80.     Upon information and belief that that has not occurred, Gateway has breached its contract with the members/Plaintiffs.

81.     Plaintiffs have been damaged as a direct and proximate result of Gateway's multiple breaches of contract in an amount to be proven at trial.

82.     All Defendants conspired to breach the contract between Gateway and its members by not returning the funds when the evidence of the breach occurred.

83.     Further, all Defendants conspired to deprive Plaintiffs of the benefit of the contract by not following through with the promises made.

Such breaches would not have been made but for the actions of all Defendants in concert.

## THIRD CLAIM FOR RELIEF

### (Fraud, Intentional, and Negligent Misrepresentation as to Robert Morris, Thomas Lane, Kevin Grove and Steve Dulin, Individually)

84.     Assuming Church policy or the law prohibits the return of tithed funds, Plaintiffs present this alternative claim for relief against Morris, Thomas Lane, Kevin Grove and Steve Dulin, in their individual capacities (the "Individual Defendants").

85.     When making the statement that tithers could receive their monies back, as the Senior Pastor of the Church, Robert Morris, Thomas Lane, Kevin Grove and Steve Dulin knew or should have known of the Church policy, as stated by counsel for the Church, prohibiting the return of tithes as promised by Robert Morris, Thomas Lane, Kevin Grove and Steve Dulin. Alternatively, Defendants never intended to return tithe dollars as promised.

86.     Accordingly, Morris and the other Individual Defendants knowingly participated in and sponsored fraud and are individually liable to Plaintiffs even though Morris and the other Individual Defendants were acting within their course and scope as Church representatives and/or employees when the promises were made to the tithers.

87.     The misrepresentation to the Plaintiffs by Morris and the other Individual Defendants was material and false at the time it was made, according to counsel for the Church's statement regarding the Church policies.

88.     Morris and the other Individual Defendants intended congregants to rely on his statement and congregants tithed hundreds of millions of dollars to the church.  The Individual Defendants conspired with one another to misrepresent facts and defraud Plaintiffs regarding the use of tithe dollars for global missions and Jewish ministries in order to induce Plaintiffs' tithing to the Church.

89.     Further, Plaintiffs relied on said promise to their detriment and donated millions of dollars to the Church.

## VII.

## ATTORNEYS' FEES AND COSTS

90.     Plaintiffs incorporate by reference the allegations made in the preceding paragraphs as if fully set forth herein.

91.     Plaintiffs seek an award of all reasonable and necessary attorneys' fees and costs under §§ 37.009 and 38.001 of the Texas Civil Practice & Remedies Code, and all other applicable statutory and common law provisions, in addition to any other relief and actual and special damages requested herein.

92.     Plaintiffs seek recovery of all reasonable and necessary attorneys' fees and costs incurred relating to this matter, including any and all attorneys' fees that may be necessary in connection with any appeal of this Court's judgment, at all levels of the appellate process.

## VIII.

## CONDITIONS PRECEDENT

93.     All conditions precedent to the relief sought by Plaintiffs have occurred or have

been performed.

## IX.

## JURY DEMAND

94.     Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a

jury trial and tender the jury fee as required.

## X.

## PRAYER

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray

for judgment as follows:

A.     A judgment certifying the proposed Federal Rule of Civil Procedure 23 and designating Plaintiffs as the named representatives of the Class, and designating the undersigned as Class Counsel;

B.     A judgment of all declaratory relief in favor of Plaintiffs and the Class, as requested in this Petition and/or any subsequent amended or supplemental petitions;

C.     A judgment in favor of Plaintiffs and the Class of all available damages allowed for by law, including interest, in an amount to be proven at trial; the monetary relief sought by the class is likely to exceed $100,000,000;

D.     Equitable relief (specific performance);

E.     An award of attorneys' fees and costs;

F.     An award of pre-judgment and post-judgment interest, as provided by law; and,

G.     Any and all further relief, both in law and equity, to which Plaintiffs may be deemed justly entitled.

Respectfully submitted,

*/s/ Timothy Micah Dortch*
**Timothy Micah Dortch**
Texas State Bar No. 24044981
Email: Micah@dll-law.com
**Lance L. Livingston**
Texas State Bar No. 24068269
Email: Lance@dll-law.com
**Dortch Lindstrom Livingston
        Law Group**
2613 Dallas Parkway, Suite 220
Plano, Texas 75093
(214) 393-1212
(888) 653-3299 fax

*/s/ Lu Pham*
**Lu Pham**
State Bar No. 15895430
Email: lpham@phamharrison.com
Caroline C. Harrison
State Bar No. 24046034
Email: charrison@phamharrison.com
**Pham Harrison, LLP**
505 Pecan Street, Suite 200
Fort Worth, Texas 76102
(817) 632-6300
(817) 632-6313 fax

*/s/ Melissa R. Smith*
**Melissa R. Smith**
State Bar No. 24001351
Email: melissa@gillamsmithlaw.com
**Gillam & Smith, LLP**
303 South Washington Avenue
Marshall, Texas 75670
(903) 934-8450
(903) 934-9257 fax

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that counsel of record who are deemed to have consented to electronic service are being served on October 18, 2024, with a copy of this document by electronic means via the Court's CM/ECF system per Local Rule CV-5(a)(3).


/s/ T. Micah Dortch
**T. MICAH DORTCH**