IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| KATHERINE LEACH, GARRY K. LEACH, MARK BROWDER, TERRI BROWDER, on behalf of themselves and those similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>GATEWAY CHURCH, ROBERT MORRIS, THOMAS M. LANE, KEVIN L. GROVE, STEVE DULIN,<br><br>*Defendants*. | Civil Action No. 4:24-cv-000885-ALM |

**BRIEF OF FIRST LIBERTY INSTITUTE AS *AMICUS CURIAE*
IN SUPPORT OF GATEWAY CHURCH'S MOTION TO DISMISS**

Kelly J. Shackelford
   Texas Bar No. 18070950
Jeffrey C. Mateer
   Texas Bar No. 13185320
Hiram S. Sasser
   Texas Bar No. 24039157
David J. Hacker
   Texas Bar No. 24103323
FIRST LIBERTY INSTITUTE
2001 W. Plano Pkwy Ste. 1600
Plano, Texas 75075
Telephone: (941) 440-4444
kshackelford@firstliberty.org
jmateer@firstliberty.org
dhacker@firstliberty.org
hsasser@firstliberty.org

Justin E. Butterfield
   Texas Bar No. 24062642
Lea E. Patterson
   Texas Bar No. 24102338
BUTTERFIELD & PATTERSON, PLLC
P.O. Box 941681
Plano, Texas 75094
Telephone: (945) 284-0700
justin@butterfieldpatterson.com
lea@butterfieldpatterson.com

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

Table of Contents ........................................................................................................... ii

Table of Authorities ...................................................................................................... iii

Interest of Amicus Curiae ............................................................................................... 1

Argument ......................................................................................................................... 2

    I.   The Ecclesiastical Abstention Doctrine's Prohibition on Courts' Delving into Church Doctrine and Operations is Crucial to the Constitution's Religious Liberty Protections. ........................................................................................... 2

    II.  Plaintiffs' Claims Require Adjudicating Theological Questions. ............... 8

Conclusion .................................................................................................................... 12

Certificate of Service ................................................................................................... 14

# TABLE OF AUTHORITIES

**Cases**

*Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29 (2019)...................................................................1

*Ballard v. United States*, 152 F.2d 941 (9th Cir. 1945)...................................................................10

*Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014)...............................................................6

*Carson as next friend of O.C. v. Makin*, 596 U.S. 767 (2022) .......................................................1, 7

*Colo. Christian Univ. v. Weaver*, 534 F.3d 1245 (10th Cir. 2008) ...................................................5

*Corp. of Presiding Bishop of Church of Jesus Christ of Latter Day Saints v. Amos*, 483 U.S. 327 (1987)...............................................................................................................................6

*Groff v. DeJoy*, 600 U.S. 447 (2023) .................................................................................................1

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 (2012).................7

*Jones v. Wolf*, 443 U.S. 595 (1979) ...................................................................................................4

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church*, 344 U.S. 94 (1952) ...............7, 8

*Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507 (2022)............................................................1, 2, 5

*Lee v. Weisman*, 505 U.S. 577 (1992)...............................................................................................4

*Lemon v. Kurtzman*, 403 U.S. 602 (1971).........................................................................................5

*New York v. Cathedral Acad.*, 434 U.S. 125 (1977)...........................................................2, 5, 9, 12

*NLRB v. Cath. Bishop of Chicago*, 440 U.S. 490 (1979) ............................................................4, 12

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732 (2020) ..........................................7

*Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440 (1969) .....................................................................................................................2, 4

*Rosenberger v. Rector and Visitors of the Univ. of Va.*, 515 U.S. 819 (1995)...........................8, 9

*Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696 (1976) ................................................4

*Spencer v. World Vision, Inc.*, 633 F.3d 723 (9th Cir. 2011) .......................................................5, 6

*Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707 (1981) .................................................... 8

*Trs. of New Life in Christ Church v. City of Fredericksburg,* 142 S. Ct. 678 (2022) .................... 8

*United States v. Ballard*, 322 U.S. 78 (1944) ....................................................................... 2, 9, 10

*United States v. Brown*, 996 F.3d 1171 (11th Cir. 2021) (*en banc*) .............................................. 6

*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) ........................................................ 3

*Watson v. Jones*, 80 U.S. 679 (1871) ........................................................................................ 4, 7

*Widmar v. Vincent,* 454 U.S. 263 (1981) ................................................................................. 7, 9

**Other Authorities**

Michael W. McConnell, *Establishment and Disestablishment at the Founding, Part I: Establishment of Religion*, 44 Wm. & Mary L. Rev. 2105 (2003) ........................................... 3

Stephanie H. Barclay, *Untangling Entanglement*, 97 Wash. U.L. Rev. 1701, 1708–10, 1727 (2020) ........................................................................................................................... 5

**INTEREST OF AMICUS CURIAE**[1]

First Liberty Institute is a nonprofit, public interest law firm dedicated to defending and restoring religious liberty for all Americans. First Liberty provides pro bono legal representation to individuals and institutions of all faiths—Catholic, Islamic, Jewish, Native American, Protestant, the Falun Gong, and others. With decades of experience advocating to protect religious liberty, including victories in *Groff v. DeJoy*, 600 U.S. 447 (2023); *Kennedy v. Bremerton School District*, 597 U.S. 507 (2022); *Carson v. Makin*, 596 U.S. 767 (2022); and *American Legion v. American Humanist Association*, 588 U.S. 29 (2019), First Liberty can provide valuable perspective on the crucial role the First Amendment's Ecclesiastical Abstention Doctrine plays in protecting religious liberty for people of all faiths. First Liberty also has a strong interest in the outcome of this litigation, because it will have an important precedential effect on the religious exercise of houses of worship. If courts are free to parse sermons to determine whether the pastor may have used language creating an implied contract, pastors will be unable to share their religious convictions freely without risking legal reprisal. Such an outcome would chill core religious exercise and would be devastating to many of First Liberty's clients and to religious freedom in general.

---

[1] Defendants who have appeared in the case to date consented to the filing of this brief. Plaintiffs are opposed, as noted in the accompanying Motion for Leave to File Brief as Amicus Curiae. No counsel for a party authored this brief in whole or in part, and no person other than amicus and its counsel made any monetary contribution intended to fund the preparation or submission of this brief.

# ARGUMENT

**I. The Ecclesiastical Abstention Doctrine's Prohibition on Courts' Delving into Church Doctrine and Operations is Crucial to the Constitution's Religious Liberty Protections.**

The First Amendment's Establishment and Free Exercise "Clauses work in tandem" to deny government the authority to create an established church and to protect the religious free exercise of all people. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 523 (2022); *United States v. Ballard*, 322 U.S. 78, 86 (1944). The Ecclesiastical Abstention Doctrine applies this principle to prohibit courts from delving into the doctrine and internal operations of churches. *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 450 (1969) (The First Amendment "forbids civil courts" from determining "the interpretation of particular church doctrines and the importance of those doctrines to the religion."); *New York v. Cathedral Acad.*, 434 U.S. 125, 133 (1977) ("The prospect of church and state litigating in court about what does or does not have religious meaning touches the very core of the constitutional guarantee against religious establishment."). Absent the Ecclesiastical Abstention Doctrine, the judiciary would be tempted to unwittingly wield religious authority in the resolution of civil disputes, as the Plaintiffs in this matter now ask this Court to do.

The historical operation of established churches informs the Ecclesiastical Abstention Doctrine's constitutional function. Historically, government control over religious doctrine and the appointment of religious leaders were key hallmarks of an established

church. Michael W. McConnell, *Establishment and Disestablishment at the Founding, Part I: Establishment of Religion*, 44 Wm. & Mary L. Rev. 2105, 2131–32 (2003). In the Church of England, "ecclesiastical questions were subjected to the control of political authorities rather than left to the internal deliberations of clergy and laity in the Church." *Id.* at 2133. In early American states with established Anglican churches, "[t]he two principal means of government control over the church were laws governing doctrine and the power to appoint prelates and clergy." *Id.* at 2131–32. As Professor McConnell explains:

> [T]he issue of government *control* over religion . . . is arguably the most salient aspect of the historical establishment. The monarchy in England and the gentry in Virginia, who controlled the Church under the establishment, were often tepid in their religious zeal and parsimonious in their support for religious ministry. Religious motives and the advancement of religion were not often in the forefront of their ecclesiastical policy. But in one respect they were consistent and insistent: the doctrines, personnel, and practices of the Church should support and reinforce the authority of the state, that is, their own authority. English kings would happily change their religious spots, as Henry VIII demonstrated, and the Virginia gentry would humiliate or impoverish an impertinent local minister, but neither would brook insubordination. The dominant purpose of the establishment was not to advance religious truth, but to control and harness religion in service of the state.

*Id.* at 2207–08.

To protect religious liberty, the First Amendment withholds from the government the power to control the church, which necessarily means withholding the power to decide issues of religious doctrine. *See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other

3

matters of opinion or force citizens to confess by word or act their faith therein."); *Lee v. Weisman*, 505 U.S. 577, 592 (1992) ("A state-created orthodoxy puts at grave risk that freedom of belief and conscience which are the sole assurance that religious faith is real, not imposed."). Ecclesiastical Abstention applies this principle in the courthouse. Accordingly, the First Amendment "forbids civil courts" from determining "the interpretation of particular church doctrines and the importance of those doctrines to the religion." *Presbyterian Church in U.S.*, 393 U.S. at 450. Courts may not resolve disputes "on the basis of religious doctrine and practice," and they may not consider "doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith." *Jones v. Wolf*, 443 U.S. 595, 602 (1979) (quotation omitted); *see Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 709 (1976) (assuming that "civil determination of religious doctrine" would inherently "violate the First Amendment") (quotation omitted); *Watson v. Jones*, 80 U.S. 679, 731 (1871) ("[T]he civil tribunal tries the civil right, and no more, taking the ecclesiastical decisions out of which the civil right arises as it finds them.").

The process of a judicial inquiry into matters that touch upon religious doctrine is as constitutionally problematic as the substantive decision itself. *NLRB v. Cath. Bishop of Chicago*, 440 U.S. 490, 502 (1979) ("The resolution of such charges by the Board, in many instances, will necessarily involve inquiry into the good faith of the position asserted by the clergy-administrators and its relationship to the school's religious mission. It is not only the conclusions that may be reached by the Board which may impinge on rights

guaranteed by the Religion Clauses, but also the very process of inquiry leading to findings and conclusions."); *Cathedral Acad.*, 434 U.S. at 133 ("The prospect of church and state litigating in court about what does or does not have religious meaning touches the very core of the constitutional guarantee against religious establishment."). "[T]he very act of making th[e] determination" as to whether an organization's actions have religious meaning is fraught with constitutional peril. *Spencer v. World Vision, Inc.*, 633 F.3d 723, 731 (9th Cir. 2011) (O'Scannlain, J., concurring); *see also id.* at 732, 734 (describing judicial efforts to "distinguish[] between the sacred and the secular" as a "constitutional briar patch" and an "unseemly judicial inquiry"); *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1263–64 (10th Cir. 2008) ("It is not for the state to decide what Catholic—or evangelical, or Jewish—'polic[y]' is on educational issues. That is a question of religious doctrine on which the State may take no position without entangling itself in an intrafaith dispute. Asking whether a university's educational policy on a given issue has 'the image or likeness of a particular religion,' is thus unconstitutional.") (citation omitted).[2]

---

[2] Many Ecclesiastical Abstention cases invoke the concept of religious "entanglement." The language of entanglement became part of the ill-fated *Lemon* test, *see Lemon v. Kurtzman*, 403 U.S. 602 (1971), which revolved around ambiguous notions of the appearance of government "endorsement" of religion and has since been overturned. *Kennedy*, 597 U.S. at 534 (describing and overturning *Lemon*). Given the shared terminology, it is important to note that Ecclesiastical Abstention's "entanglement" is distinct from *Lemon* and does *not* look for the appearance of "endorsement"; it looks for the risk that government scrutiny of church operations will result in government control of religious doctrine and exercise. *See* Stephanie H. Barclay, *Untangling Entanglement*, 97 Wash. U.L. Rev. 1701 (2020).

Ecclesiastical Abstention is particularly important to protecting the religious exercise of minority faiths, whose beliefs a court is less likely to understand. *See, e.g., World Vision*, 633 F.3d at 732 n.8 (O'Scannlain, J., concurring) ("The same is true for factors which ask this court to determine whether an organization includes "prayer" or "worship" in its activities, or whether it disseminates a "religious" curriculum. While these questions are relatively easy in some contexts, they might prove more difficult when dealing with religions whose practices do not fit nicely into traditional categories. In such a scenario, it is questionable whether a court is competent to distinguish religious speech (or instruction) from other activities."); *see also United States v. Brown*, 996 F.3d 1171, 1193–94 (11th Cir. 2021) (*en banc*) (discussing the judiciary's challenges to understanding minority religious expression).

Any judicial determination that entails resolving questions of theological import, even implicitly, is Constitutionally prohibited. *See, e.g., World Vision*, 633 F.3d at 731 (O'Scannlain, J., concurring); *Corp. of Presiding Bishop of Church of Jesus Christ of Latter Day Saints v. Amos*, 483 U.S. 327, 343–44 (1987) (Brennan, J., concurring) ("What makes the application of a religious-secular distinction difficult is that the character of an activity is not self-evident. As a result, determining whether an activity is religious or secular requires a searching case-by-case analysis. This results in considerable ongoing government entanglement in religious affairs."). *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 724 (2014) ("HHS and the principal dissent in effect tell the plaintiffs that their

beliefs are flawed. For good reason, we have repeatedly refused to take such a step."). This structural limitation on courts' authority holds true in a wide variety of contexts, including:

1. Church property disputes, *see, e.g.*, *Watson*, 80 U.S. 679;

2. Church governance disputes, *see, e.g.*, *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church*, 344 U.S. 94 (1952);

3. Church employment disputes, *see, e.g.*, *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 (2012), *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 761 (2020) ("Deciding such questions [as whether someone is a co-religionist] would risk judicial entanglement in religious issues.");

4. Enforcement of restrictions on religious uses of funding, *see, e.g.*, *Carson as next friend of O.C. v. Makin*, 596 U.S. 767, 787 (2022) ("Any attempt to give effect to such a distinction [between religious status and religious uses of funding] by scrutinizing whether and how a religious school pursues its educational mission would also raise serious concerns about state entanglement with religion and denominational favoritism."); and

5. Efforts to distinguish between kinds of religious speech, *see Widmar v. Vincent*, 454 U.S. 263, 269 n. 6 (1981) (rejecting dissent's attempt to distinguish between religious worship and religious speech); *Rosenberger v. Rector and Visitors of the*

*Univ. of Va.*, 515 U.S. 819, 844–45, 867, 876–877 (1995) (rejecting dissent's argument that the court should distinguish between religious "indoctrination" and "descriptive examination of religious doctrine").

Ultimately, the Ecclesiastical Abstention Doctrine recognizes that "the judicial process is singularly ill equipped to resolve" religious disputes, *see Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 715 (1981), and accomplishes the First Amendment's guarantee that "religious persons would enjoy the right 'to decide for themselves, free from state interference, matters of . . . faith and doctrine.'" *Trs. of New Life in Christ Church v. City of Fredericksburg,* 142 S. Ct. 678, 679 (2022) (Gorsuch, J., dissenting from denial of cert.) (quoting *Kedroff,* 344 U.S. at 116).

## II. Plaintiffs' Claims Require Adjudicating Theological Questions.

Ecclesiastical Abstention requires the Court to dismiss Plaintiffs' claims, because adjudicating these claims would require the Court to answer several religious questions, including (1) interpreting the meaning of a pastor's sermon; (2) defining the meaning of "tithe"; and (3) conducting fact-finding into the religious purposes of every donation Gateway received or made during the relevant time period. All of these inquiries are constitutionally impermissible.

Plaintiffs' claims for fraud, misrepresentation, and breach of contract revolve around two alleged statements: (1) that a senior pastor's statement promised "tithers could get their money back"; and (2) that Gateway intended to donate "15% of church tithing

dollars" to "international missions and Jewish ministries." *See* Pls.' Am. Compl. ¶¶18, 37, 68. With respect to the first, Plaintiffs are effectively asking the Court to interpret a sermon. Was the senior pastor's alleged statement a general promise of refundability if anyone is dissatisfied with any aspect of the Church's operation at any time? *See* Pls.' Amend. Compl. ¶37. Or was it an explanation of a theological concept that specifically referred to religious satisfaction with the blessings of tithing? *See* Def.'s Mot. to Dismiss at 22. For Plaintiffs' claims to prevail, the Court would have to decide that the statement, given in a sermon, has only secular meaning, making the Court the arbiter of what constitutes religious speech and practice. A court cannot adjudicate such a question. *See Cathedral Acad.*, 434 U.S. at 133 ("[L]itigating in court about what does or does not have religious meaning touches the very core of the constitutional guarantee against religious establishment."); *see also Widmar*, 454 U.S. at 269 n. 6 (rejecting dissent's attempt to distinguish between religious worship and religious speech); *Rosenberger*, 515 U.S. at 844–45, 867, 876, 877 (rejecting dissent's argument that the court should distinguish between religious "indoctrination" and "descriptive examination of religious doctrine"). On the other hand, if the Court accepted the Church's description, the Court would then face the obviously nonjusticiable question of whether the Plaintiffs were satisfactorily blessed because of their faithfulness in tithing.

*United States v. Ballard*, 322 U.S. 78 (1944), is instructive. Edna and Donald Ballard claimed to be divine messengers appointed by the late Guy Ballard "alias Saint Germain,

Jesus, George Washington, and Godfre Ray King" and to have the power to heal all manner of illnesses. *Id.* at 79–80. Their fundraising activities resulted in federal mail fraud charges. *Id.* The Supreme Court held that while the jury could consider whether the Ballards were sincere in making their religious statements, no court could adjudicate the truth or falsity of those statements. *Id.* at 86–87; *see Ballard v. United States*, 152 F.2d 941, 945 (9th Cir. 1945) (denying rehearing) (Denman, J., dissenting) (describing prosecutors' "bitter repeated denunciations of the Ballards because they had not only failed to make proof of the miraculous occurrence in the past but also because they had not caused it to occur before the jury during the course of the trial"). As the Supreme Court explained:

> Heresy trials are foreign to our Constitution. Men may believe what they cannot prove. They may not be put to the proof of their religious doctrines or beliefs. Religious experiences which are as real as life to some may be incomprehensible to others. Yet the fact that they may be beyond the ken of mortals does not mean that they can be made suspect before the law. . . . The miracles of the New Testament, the Divinity of Christ, life after death, the power of prayer are deep in the religious convictions of many. If one could be sent to jail because a jury in a hostile environment found those teachings false, little indeed would be left of religious freedom. . . . The religious views espoused by respondents might seem incredible, if not preposterous, to most people. But if those doctrines are subject to trial before a jury charged with finding their truth or falsity, then the same can be done with the religious beliefs of any sect. When the triers of fact undertake that task, they enter a forbidden domain.

*Ballard*, 322 U.S. at 86–87. A Court cannot adjudicate religious truth in civil fraud claims any more than it can for criminal fraud claims. Pastors should not have to have lawyers approve their sermons lest they accidentally create legal obligations with their exegesis, and if Plaintiffs' claims can proceed, that is exactly what a prudent church would have to

10

do.

Finally, the Plaintiffs' claims relating to Gateway's donations to international and Jewish ministries also raise prohibited religious questions and require an entangling inquiry into church operations. The Plaintiffs use words like "tithes," "donations," "support," and "money" interchangeably throughout the complaint, *see, e.g.*, *id.* ¶¶15–18, 68, but not all donations are necessarily tithes. As Gateway explains, *see* Def.'s Mot. to Dismiss 11–12, tithing is a religious concept that often refers to donations given for particular religious reasons, which vary among churches and people. The Court cannot permissibly adjudicate between parties' differing concepts of tithing. And even if the Court were to ask Gateway to articulate its theology of tithing and took that description as a given, deciding whether Gateway fulfilled the alleged promise yields even more religious inquiry, including (1) determining whether the alleged promise to donate "15% of church tithing dollars" to "international missions and Jewish ministries," Pls. Am. Compl. ¶68, means 15% of congregants' tithes or 15% of the Church's own tithe (*compare* Pls.' Am. Compl. ¶18 *with* ¶21)[3]; (2) distinguishing between tithe and non-tithe donations to calculate what amount the Church should have given, and (3) weighing the religious purposes of all of the Church's donations to determine what percentage went to

---

[3] Notably, Plaintiffs do not actually allege that their donations were tithes. *See* Pls.' Am. Compl. ¶68 ("In reliance upon the many promises by Senior Pastor Robert Morris, Thomas M. Lane, Kevin L. Grove, Steve Dulin and the Church, that 15% of church tithing dollars would go to international missions and Jewish ministries, the Plaintiffs and Plaintiff class members donated money.").

"international missions and Jewish ministries."[4] Just doing the math is fraught with religious inquiry and is deeply entangled in the Church's internal administration, if not outright impossible. *See Cathedral Acad.*, 434 U.S. at 133; *Cath. Bishop of Chicago*, 440 U.S. at 502.

* * *

Ultimately, allowing the Plaintiffs' claims to proceed would create a dangerous precedent that invites theological disputes to become court disputes and threatens to chill religious speech and exercise. Allowing disgruntled congregants (which few churches lack) to haul the church into court because they disagree with its use of their tithes opens a Pandora's Box of litigation into every aspect of a church's internal decisionmaking. To preserve the freedom of all to practice their religion, the Constitution properly withholds jurisdiction from such matters.

## **CONCLUSION**

For the foregoing reasons, Gateway Church's Motion to Dismiss should be granted.

---

[4] Plaintiffs' complaint also vacillates between describing the alleged promise as to give to international ministries, Jewish ministries, or a combination of the two. *See, e.g.*, Pls. Am. Compl. ¶¶18–20, 68.

Dated: December 19, 2024

Kelly J. Shackelford
   Texas Bar No. 18070950
Jeffrey C. Mateer
   Texas Bar No. 13185320
Hiram S. Sasser
   Texas Bar No. 24039157
David J. Hacker
   Texas Bar No. 24103323
FIRST LIBERTY INSTITUTE
2001 W. Plano Pkwy Ste. 1600
Plano, Texas 75075
Telephone: (941) 440-4444
kshackelford@firstliberty.org
jmateer@firstliberty.org
dhacker@firstliberty.org
hsasser@firstliberty.org

Respectfully submitted,

 /s/ Lea E. Patterson
Lea E. Patterson
   Texas Bar No. 24102338
Justin E. Butterfield
   Texas Bar No. 24062642
BUTTERFIELD & PATTERSON, PLLC
P.O. Box 941681
Plano, Texas 75094
Telephone: (945) 284-0700
lea@butterfieldpatterson.com
justin@butterfieldpatterson.com

*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on December 19, 2024, I filed a copy of the foregoing Brief of Amicus Curiae with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

/s/ *Lea E. Patterson*
Lea E. Patterson
