# United States District Court
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

KATHERINE LEACH, GARRY K.
LEACH, MARK BROWDER, TERRI
BROWDER, on behalf of themselves and
those similarly situated,

       *Plaintiffs*,

v.

GATEWAY CHURCH, ROBERT
MORRIS, THOMAS M. LANE, KEVIN
L. GROVE, STEVE DULIN,

       *Defendants*.

§
§
§
§
§
§
§
§
§
§
§
§
§
§

Civil Action No. 4:24-cv-885

Judge Mazzant

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendant Gateway Church's Motion to Dismiss for Lack of Subject Matter Jurisdiction and Failure to State a Claim and Brief in Support (Dkt. #24), and Defendant Robert Morris's Motion to Dismiss and Supporting Memorandum Brief (Dkt. #58) (the "Motions"). Having considered the Motions and the relevant pleadings, the Court finds the Motions should be **DENIED**.

## BACKGROUND

### A.  Factual Background

Plaintiffs Katherine Leach, Garry K. Leach, Mark Browder, Terri Browder, on behalf of themselves and those similarly situated ("Plaintiffs")—former Gateway Church members and tithers—bring this class action lawsuit against Defendants Gateway Church ("Gateway") and Robert Morris ("Morris") (collectively, "Defendants") (Dkt. #9 at pp. 2–3). Plaintiffs have asserted claims against Defendants for fraud, misrepresentation, and breach of contract arising out of their alleged misappropriation of tithe funds (Dkt. #9 at ¶¶ 67–89).

Specifically, Plaintiffs allege Defendants induced Plaintiffs to donate money to Gateway by falsely representing fifteen percent (15%) of all donations would be distributed to global missions and Jewish ministry partners (Dkt. #9 at ¶¶ 17–28). Plaintiffs further allege Defendants guaranteed Plaintiffs a refund of their donated funds if Plaintiffs were dissatisfied with Gateway's use of such funds (Dkt. #9 at ¶¶ 37–38). Plaintiffs' efforts to seek transparency and substantiation for Gateway's use of Plaintiffs' donations or to otherwise recover any allegedly misappropriated tithe funds have not been successful (Dkt. #9 at ¶¶ 39–41). Defendants deny Plaintiffs' allegations (Dkt. #24; Dkt. #58).

Gateway is one of the largest nondenominational churches in the United States with current and past membership exceeding 100,000 members (Dkt. #9 at ¶¶ 3, 11, 13). Morris, a Texas resident, was Gateway's founder and served as Gateway's Senior Pastor until June 2024 (Dkt. #9 at ¶¶ 19, 48; Dkt. #24 at p. 14). Gateway was organized under Title 2, Chapter 2 of the Texas Business Organizations Code as a Texas nonprofit religious organization (Dkt. #9 at ¶ 47; Dkt. #24-3 at p. 4). However, Gateway is not just a Texas church (Dkt. #9 at ¶ 5). In addition to their "Online Campus," Gateway has various physical campuses, nine of which are in Texas and one in Wyoming (Dkt. #9 at ¶¶ 4–5; Dkt. #24 at p. 13 n.3).

Gateway's tithing members have supported Gateway since its founding, and Gateway uses a platform, PushPay, to process its tithing members' donations (Dkt. #9 at p. 4; Dkt. #24-2 at ¶¶ 6–8). Through PushPay, donors or tithers self-report their residency information, which Gateway gathers and retains pursuant to tax reporting requirements (Dkt. #24 at p. 10; Dkt. #24-2 at ¶ 7). Based on records kept since 2019, Gateway receives donations from over 20,000 donors per year

(Dkt. #24-2 at ¶ 6). From 2019 to 2024, on average, about 90% of the individuals who donated to Gateway in one calendar year self-reported as Texas residents (Dkt. #24-2 at ¶ 6).

Because Gateway's membership exceeds 100,000 members since its founding, Plaintiffs allege the proposed class will consist of "tens of thousands of persons," including members that do not reside in Texas (Dkt. #9 at ¶¶ 3–4). Plaintiffs have initially defined the proposed class as follows: (a) "All persons who donated money to Gateway Church in reliance upon the 15% promise for the funds to go to Global Mission work," and (b) "All persons who want their money back pursuant to the guarantee of Gateway and Robert Morris" (Dkt. #9 at ¶ 54).

### B. Procedural Background

On November 25, 2024, Gateway filed its Motion to Dismiss (Dkt. #24). On December 16, 2024, Plaintiffs filed their Response (Dkt. #30). On December 19, 2024, the Court received the Brief of First Liberty Institute as *Amicus Curiae* in Support of Gateway Church's Motion to Dismiss (Dkt. #34). On December 23, 2024, Defendant Gateway filed its Reply (Dkt. #37). On February 18, 2025, under the same grounds as Gateway's Motion, Morris filed his Motion Dismiss (Dkt. #58). On March 25, 2025, Plaintiffs filed their response (Dkt. #70). On April 15, 2025, Morris filed his Reply (Dkt. #71).

The Motions to Dismiss are ripe for adjudication.

## LEGAL STANDARD

### I.    12(b)(1) Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(1) authorizes dismissal of a case for lack of subject matter jurisdiction when the district court lacks statutory and constitutional power to adjudicate the case. *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998).

If a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the Court will consider the jurisdictional attack under Rule 12(b)(1) before addressing any attack on the legal merits. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

In deciding the motion, the Court may consider "(1) the complaint alone; (2) the complaint supplemented by the undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the [C]ourt's resolution of disputed facts." *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008) (quoting *Barrera-Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996)). The Court will accept as true all well-pleaded allegations set forth in the complaint and construe those allegations in the light most favorable to the plaintiff. *Truman v. United States*, 26 F.3d 592, 594 (5th Cir. 1994). Once a defendant files a motion to dismiss under Rule 12(b)(1) and challenges jurisdiction, the party invoking jurisdiction has the burden to establish subject matter jurisdiction. *See Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980). The Court will grant a motion to dismiss for lack of subject matter jurisdiction only if it appears certain that the claimant cannot prove a plausible set of facts to support a claim that would entitle it to relief. *Lane*, 529 F.3d at 557.

## II.     12(b)(6) Motion to Dismiss

The Federal Rules of Civil Procedure require that each claim in a complaint include a "short and plain statement . . . showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Each claim must include enough factual allegations "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

A Rule 12(b)(6) motion allows a party to move for dismissal of an action when the complaint fails to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). When considering a

motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded facts in the plaintiff's complaint and view those facts in the light most favorable to the plaintiff. *Bowlby v. City of Aberdeen,* 681 F.3d 215, 219 (5th Cir. 2012). The Court may consider "the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). The Court must then determine whether the complaint states a claim for relief that is plausible on its face. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "But where the well-pleaded facts do not permit the [C]ourt to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting FED. R. CIV. P. 8(a)(2)).

In *Iqbal*, the Supreme Court established a two-step approach for assessing the sufficiency of a complaint in the context of a Rule 12(b)(6) motion. First, the Court should identify and disregard conclusory allegations, for they are "not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 664. Second, the Court "consider[s] the factual allegations in [the complaint] to determine if they plausibly suggest an entitlement to relief." *Id.* "This standard 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary claims or elements.'" *Morgan v. Hubert*, 335 F. App'x 466, 470 (5th Cir. 2009) (citation omitted). This evaluation will "be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Thus, "[t]o survive a motion to dismiss, a

complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).

## ANALYSIS

Defendants urge the Court to dismiss Plaintiffs' class action lawsuit for the following reasons: (1) Plaintiffs' claims should be dismissed under Rule 12(b)(1) for lack of jurisdiction; (2) Plaintiffs' fraud allegations should be dismissed because they fail the exacting pleading standards under Rule 9(b) and fail to state a viable claim under Rule 12(b)(6); and (3) Plaintiffs' breach of contract and conspiracy to breach contract allegations fail to state a viable claim under Rule 12(b)(6). The Court considers each argument in turn.

### I.    12(b)(1) Motions to Dismiss

Defendants request the Court abstain from exercising its Class Action and Fairness Act ("CAFA") jurisdiction based on two doctrines: (a) the "home state" exception; and (b) ecclesiastical abstention.

#### a.  Home State Exception Doctrine

The Court will begin by addressing one of the mandatory abstention provisions of the CAFA; namely, the home state exception. CAFA grants federal courts original jurisdiction to hear interstate class actions where: (1) the proposed class contains more than 100 members; (2) minimal diversity exists between the parties; (3) the amount in controversy exceeds $5,000,000; and (4) the primary defendants are not states, state officials, or other governmental entities. 28 U.S.C. § 1332(d)(2), (5). Here, Defendants do not contest Plaintiffs have met these preliminary elements.

However, CAFA seeks "to draw a delicate balance between making a federal forum available to genuinely national litigation and allowing the state courts to retain cases when the controversy

is strongly linked to that state." *Hollinger v. Home State Mut. Ins. Co.*, 654 F.3d 564, 570 (5th Cir. 2011) (citing *Hart v. FedEx Ground Package Sys., Inc.*, 457 F.3d 675, 682 (7th Cir. 2006)). "Therefore, [CAFA] provides a number of scenarios in which federal courts must abstain from exercising jurisdiction." *Madison v. ADT, L.L.C.*, 11 F.4th 325, 327 (5th Cir. 2021) (citing *Hollinger*, 654 F.3d at 570). One such scenario is the home state exception, "whereby the court must abstain if 'two-thirds or more of the members of all proposed plaintiff classes in the aggregate, and the primary defendants, are citizens of the State in which the action was originally filed.'" *Id.* (citing *Hollinger*, 654 F.3d at 570; 28 U.S.C. § 1332(d)(4)(B)).

Here, Defendants argue the home state exception under CAFA strips the Court of its jurisdiction over Plaintiffs' class action claims (Dkt. #24 at pp. 18–19; Dkt. #58 at p. 3). As the parties objecting to the Court's jurisdiction, Defendants have the burden to prove, by a preponderance of the evidence, the elements of this exception. *Preston v. Tenet Healthsys. Mem'l Med. Ctr., Inc. ("Preston I"),* 485 F.3d 793, 797 (5th Cir. 2007); *Frazier v. Pioneer Americas, L.L.C.,* 455 F.3d 542, 546 (5th Cir. 2006); *Hollinger*, 654 F.3d at 571. Because the parties agree Defendants are citizens of Texas, the only element at issue is whether—it is more likely than not—"two-thirds or more" of the members of the proposed class are citizens of Texas. 28 U.S.C. § 1332(d)(4)(B); *Hollinger*, 654 F.3d at 572.

As an initial matter, Plaintiffs argue Defendants' reliance on the home state exception is premature and would be better handled at the class certification stage, when the full class can be better ascertained or determined (Dkt. #30 at pp. 9–10). The Court rejects this argument because jurisdictional determinations, which can be raised at any point throughout the ligation, require the class to be defined but not necessarily certified. *Stewart v. Entergy Corp.*, 35 F.4th 930, 932 (5th Cir.

2022) ("To determine whether two-thirds of a proposed class are citizens of the state in which a class action was originally filed, we must first define the class"). At this stage of the litigation, the Court can consider whether Defendants met their burden to establish the home state exception.

"In making a jurisdictional assessment, a federal court is not limited to the pleadings; it may look to any record evidence, and may receive affidavits, deposition testimony or live testimony concerning the facts underlying the citizenship of the parties." *Coury v. Prot*, 85 F.3d 244, 249 (5th Cir. 1996). "The court has wide, but not unfettered, discretion to determine what evidence to use in making its determination of jurisdiction." *Coury*, 85 F.3d at 249. Here, Gateway has provided the Court with the Declaration of Gateway's Associate Director of Revenue (the "Declaration"), who reviews and maintains Gateway's records of income, including records of donors who have given financial support to Gateway (Dkt. #24-2 at ¶ 2). Included in the Declaration is a chart detailing the number of Gateway's total donors and Texas donors year-over-year (Dkt. #24-2 at ¶ 6). Plaintiffs argue the chart within the Declaration is inadmissible under Federal Rule of Evidence 1006 as the underlying data has not been provided to Plaintiffs, is conclusory, lacks foundation, and is incomplete (Dkt. #30 at p. 9; Dkt. #70 at p. 5). Even if this argument had merit, the Declaration is insufficient to meet Defendants' evidentiary burden.

Defendants failed to show the Court by a preponderance of the evidence that at least two-thirds of the proposed class members are Texas citizens. First, the Declaration suggests that in one given calendar year, about 90% of all donors self-reported as being Texas residents. However, the information referenced in the Declaration fails to show how many of those donating members represented in one year are unique members that did not self-report the same residency information the next year. For example, according to the Declaration, the non-Texas donors that donated to

8

Gateway every year from 2019 to 2023 (approximately 2,000 donors per year), could be completely different people from one year to the next, but the Texas donors could be the same annual donors every year from 2019 to 2023; meaning, from 2019 to 2023, Gateway could have received donations from about 10,000 unique non-Texas donors and 23,000 Texas donors. In this scenario, the self-reported Texas donors would only represent approximately 57% of the total donors, which does not meet the requisite "two-thirds or more" element of the home state exception. Without more data, Defendants have merely shown the Court that in one year, 90% of donors self-reported as Texas residents, which fails to address that Plaintiffs' proposed class members are not isolated to a cohort of donors from any one given calendar year.

Second, Plaintiffs' alleged injury is not unique to only Texas donors. Again, Plaintiffs have initially defined the proposed class as follows: (a) "All persons who donated money to Gateway Church in reliance upon the 15% promise for the funds to go to Global Mission work," and (b) "All persons who want their money back pursuant to the guarantee of Gateway and Robert Morris" (Dkt. #9 at ¶ 54). These definitions provided to the Court do not isolate the potential class members to Texans. Instead, since its founding, Gateway's membership across its various physical campuses and "Online Campus" exceeds 100,000 members from various states, and Plaintiffs allege the proposed class will consist of "tens of thousands of persons," including members that do not reside in Texas (Dkt. #9 at ¶¶ 3–4). Moreover, Defendants did not address a scenario in which the class mostly consists of Gateway's members from its Wyoming campus. To have met their burden, Defendants could have provided the Court with the residency information, if available, of its tithing members who made formal demands for the return of their donations—which would have been members that fell squarely in the definition of the proposed class. Had that residency information

9

shown that at least 67% were Texan citizens, then the Court would have been prevented from exercising its jurisdiction over Plaintiffs' claims.

Third, "[c]itizenship, for purposes of proving an exception to CAFA, must be analyzed as of the date the complaint or amended complaint was filed." *Hollinger*, 654 F.3d at 573 (citing 28 U.S.C. § 1332(d)(7); *Preston I,* 485 F.3d at 798; *Martin v. Lafon Nursing Facility,* 548 F. Supp. 2d 268, 271 (E.D. La. 2008)). Here, just because a donor, who may or may not be a member of the proposed class, self-reported as a Texas resident in 2019, 2020, 2021, 2022, or 2023, does not mean they were still a Texas resident when Plaintiffs filed their Amended Complaint. At this time, Defendants have not provided the Court with sufficient evidence to contradict Plaintiffs' allegations establishing the Court's CAFA jurisdiction.

Accordingly, because Defendants failed to show by a preponderance of the evidence that more than two-thirds of the proposed class are Texas citizens, the Court is not required to abstain from exercising its subject matter jurisdiction over Plaintiffs' claims as to Defendants.

### b. Ecclesiastical Abstention Doctrine

Now, the Court will address the ecclesiastical abstention doctrine, also known as the religious autonomy doctrine, as a basis for dismissal. Defendants argue Plaintiffs' claims should be dismissed under Federal Rule of Civil Procedure 12(b)(1) because Plaintiffs' claims will require the Court to impermissibly entangle itself in questions of religious doctrine and internal church administration (Dkt. #24 at pp. 19–20; Dkt. #58 at p. 3).

Under the ecclesiastical abstention doctrine, "courts are prohibited by the First Amendment from involving themselves in ecclesiastical matters, such as disputes concerning theological controversy, church discipline, ecclesiastical government, or the conformity of the

members of the church to the standard of morals required." *Klouda v. Sw. Baptist Theological Seminary*, 543 F. Supp. 2d 594, 611 (N.D. Tex. 2008) *(*citing *Watson v. Jones,* 80 U.S. (13 Wall.) 679, 733 (1871)). The doctrine serves as a limitation on the Court's jurisdiction over a dispute requiring resolution of "strictly and purely ecclesiastical" questions. *Serbian E. Orthodox Diocese for U.S. and Can. v. Milivojevich*, 426 U.S. 696, 713 (1976). "[M]atters of church government, as well as those of faith and doctrine" constitute purely ecclesiastical questions. *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 115–16 (1952).

However, "[t]he First Amendment does not categorically insulate religious relationships from judicial scrutiny, for to do so would necessarily extend constitutional protection to the secular components of these relationships," which "would impermissibly place a religious leader in a preferred position in our society." *Sanders v. Casa View Baptist Church*, 134 F.3d 331, 335–36 (5th Cir. 1998); *see also Jones v. Wolf*, 443 U.S. 595, 602 (1979) (holding courts may apply neutral principles of law to resolve church property disputes). As such, "[c]ourts may decide disputes that implicate religious interests as long as they can do so based on 'neutral principles' of secular law without undue entanglement in issues of religious doctrine." *McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.*, 966 F.3d 346, 348–49 (5th Cir. 2020) (quoting *Merkos L'Inyonei Chinuch, Inc. v. Otsar Sifrei Lubavitch, Inc.*, 312 F.3d 94, 99–100 (2d Cir. 2002)). Thus, the issue before the Court is whether it appears that the resolution of Plaintiffs' claims will require the Court to address purely ecclesiastical questions.

Presently, Plaintiffs allege the following: (1) Gateway, a Texas nonprofit religious organization, is one of the largest nondenominational churches in the United States with current and past membership exceeding 100,000 members (Dkt. #9 at ¶¶ 3, 11, 13, 47); (2) Morris, a Texas

resident, was Gateway's founder and served as Gateway's Senior Pastor until June 2024 (Dkt. #9 at ¶¶ 19, 48); (3) Defendants induced Plaintiffs to donate money to Gateway by falsely representing fifteen percent (15%) of all donations would be distributed to global missions and Jewish ministry partners (Dkt. #9 at ¶¶ 17–28); (4) Defendants guaranteed Plaintiffs a refund of their donated funds if Plaintiffs were dissatisfied with Gateway's use of such funds (Dkt. #9 at ¶¶ 37–38); and Plaintiffs' efforts to recover such donations, or otherwise inquire about the use of the donations, have not been successful (Dkt. #9 at ¶¶ 39–41). Based off these allegations, Plaintiffs brought this suit against Defendants, claiming fraud, misrepresentation, and breach of contract (Dkt. #9 at ¶¶ 67-89).

Defendants argue neutral principles of law cannot resolve Plaintiffs' claims because "Plaintiffs' claims necessarily touch on the religious doctrine and practice of tithing and intrude in Gateway's internal affairs and administration" (Dkt. #37 at p. 8; Dkt. #71 at p. 4). Specifically, Defendants argue Plaintiffs' claims will require the Court to determine whether tithing may be refunded if the donor later expresses dissatisfaction with its use; Plaintiffs' claims directly impinge on Gateway's ability to set policy regarding the receipt and allocation of tithing donations; and Plaintiffs' claims will require the Court to define "Jewish" and "ministry partner" and determine whether a recipient of the tithings meets that definition (Dkt. #24 at p. 21; Dkt. #71 at p. 4).

At this stage, many of the relevant facts have not been developed, and it cannot yet be determined whether Plaintiffs' claims will require the Court to address purely ecclesiastical questions. First, based on Defendants' outline of the issues before the Court, Defendants have not established the disputed financial expenditures from Plaintiffs' tithes were approved by a committee or governing body based on Gateway's religious doctrine. In fact, Defendants have not

alleged where the donations Plaintiffs now contest went to at all. Second, Defendants have not pointed to any church policy outlining that its contested expenditures were justified by Gateway's religious teachings. Again, Plaintiffs claims arise out of the alleged misappropriation of tithe funds by Gateway, Morris, and other Gateway leaders (Dkt. #9 at ¶¶ 67–89). Third, the Parties have not alleged they have differing definitions of "Jewish ministry partners" or any other term at issue in Plaintiffs claims that the Court would have to resolve.

At this point, Plaintiffs' claims seemingly address Defendants' non-religious conduct: acts of concealment; discrepancies in the reconciliation of donated funds balances; unaccounted for donations; financial irregularities; and lack of transparency or substantiations for Gateway's use of Plaintiffs' donations (Dkt. #9 at ¶¶ 28–30, 36, 42). Merely because Defendants identify Plaintiffs' tithing as an inherently religious act does not prevent the Court from exercising its jurisdiction over Plaintiffs' claims. The Court acknowledges the act of tithing is a religious act, but Plaintiffs do not dispute their tithing; rather, Plaintiffs allege their tithes were fraudulently allocated and Defendants misrepresented critical facts to Plaintiffs before tithing (Dkt. #34 at p. 15; Dkt. #9 at ¶¶ 67–89). At this point, whether Defendants made an improper or proper financial expenditure is not a "strictly and purely ecclesiastical" question. *Serbian E. Orthodox Diocese,* 426 U.S. at 713. Because Plaintiffs' Complaint asks the Court to apply neutral principles of Texas law to a case that, on the face of the Complaint, involves a civil rather than religious dispute, at this time, the Court is not barred by the ecclesiastical abstention doctrine from exercising its subject matter jurisdiction over Plaintiffs' claims as to Defendants.

Accordingly, Defendants' 12(b)(1) Motion is **DENIED WITHOUT PREJUDICE** with respect to Defendants' arguments and may be refiled once the record is better developed.

## II.    12(b)(6) Motions to Dismiss

The Court will now address whether Plaintiffs' Complaint should be dismissed under Rule 12(b)(6). Defendants argue all of Plaintiffs' claims fail to meet the applicable pleading standards and are barred by the relevant statute of limitations (Dkt. #24 at pp. 24–39; Dkt. #58 at p. 3). After reviewing Plaintiffs' Complaint and the arguments presented in the briefs, Plaintiffs have stated plausible claims for relief under Rule 12(b)(6). Further, Plaintiffs alleged sufficient facts to establish their fraud and breach of contract claims began to accrue at their discovery in 2024, when Plaintiffs experienced the lack of transparency or substantiation for Gateway's use of Plaintiffs' tithes (Dkt. #9 at ¶¶ 34, 36, 42). Accordingly, dismissal is unwarranted, and Defendants' 12(b)(6) Motions should therefore be **DENIED**.

## III.    Plaintiffs' Request to Replead

Plaintiffs request the Court permit Plaintiffs to replead to add additional causes of action and new parties (Dkt. #30 at pp. 29–30). According to the Court's Scheduling Order, Plaintiffs had until February 27, 2026, to file a motion for leave to amend their pleadings under Federal Rule of Civil Procedure 15(a). The Court grants Plaintiffs' request to replead and must do so within fourteen (14) days from the date of this Order.

Lastly, because the Court stayed all deadlines after Defendants' Motions were filed (Dkt. #73), the Court requests the parties confer and submit a jointly proposed amended scheduling order to the Court within thirty (30) days from the date of this Order.

## CONCLUSION

It is therefore **ORDERED** that Defendant Gateway Church's Motion to Dismiss for Lack of Subject Matter Jurisdiction and Failure to State a Claim and Brief in Support (Dkt. #24) and

Defendant Robert Morris's Motion Dismiss and Supporting Memorandum Brief (Dkt. #58) are hereby **DENIED**.

It is further **ORDERED** that Plaintiffs be granted leave to file a further amended complaint no later than fourteen (14) days from the date of this Order.

It is further **ORDERED** that the parties submit a jointly proposed amended scheduling order to the Court within thirty (30) days from the date of this Order.

**IT IS SO ORDERED.**

**SIGNED this 17th day of September, 2025.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE