# United States District Court
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| KATHERINE LEACH, GARRY K. LEACH, MARK BROWDER, TERRI BROWDER, on behalf of themselves and those similarly situated, | § § § § § | |
| *Plaintiffs*, | § | Civil Action No. 4:24-cv-885 |
| v. | § | Judge Mazzant |
| | § | |
| GATEWAY CHURCH, ROBERT MORRIS, and STEVE DULIN, | § § | |
| | § | |
| *Defendants*. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Pending before the Court are two motions to dismiss, a motion to stay discovery, and a motion to strike class allegations (the "Motions") (Dkt. #83; Dkt. #84; Dkt. #85; Dkt. #87). Having considered the Motions, the relevant pleadings, and the applicable law, the Court finds as follows:

1. Gateway Church's Motion to Dismiss Second Amended Complaint for Lack of Subject Matter Jurisdiction and Failure to State a Claim and Brief in support (Dkt. #83) should be **GRANTED**;

2. Motion to Stay Discovery Pending Resolution of Gateway's Motion to Dismiss Second Amended Complaint for Lack of Subject Matter Jurisdiction and Failure to State a Claim (Dkt. #84) should be **DENIED as moot**;

3. Defendant Robert Morris's Partial Motion to Dismiss and Brief in Support and Motion for Extension of Time to File an Answer (Dkt. #85) should be **GRANTED**; and

4. Defendant Robert Morris's Motion to Strike Class Allegations and Brief in Support (Dkt. #87) should be **DENIED as moot**.

## BACKGROUND

### A.      Factual Background

On September 17, 2025, the Court entered a Memorandum Opinion and Order (the "September 17 Order") that (1) denied Defendants Gateway Church ("Gateway") and Robert Morris's ("Morris") motions to dismiss Plaintiffs' first amended complaint, and (2) allowed Plaintiffs to replead (Dkt. #77). On October 13, 2025, Plaintiffs filed their second amended complaint, through which they assert several claims pursuant to the Class Action Fairness Act ("CAFA") against Gateway, Morris, and Steve Dulin[1] (collectively, "Defendants") (Dkt. #80).

In their second amended complaint, Plaintiffs assert the following causes of action against Defendants: (1) "Misrepresentation and Fraud (and conspiracy between all Defendants)" (Dkt. #80 at ¶¶ 65–71); (2) "Breach of Contract and Conspiracy to Breach Contract against all Defendants" (Dkt. #80 at ¶¶ 72–81); (3) "Fraud, Intentional, and Negligent Misrepresentation as to Robert Norris, and Steven Dullin, Individually" (Dkt. #80 at ¶¶ 82–86); and (4) "[Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968] Violations (Mail Fraud and Wire Fraud) Against All Defendants" (Dkt. #80 at ¶¶ 87–97). Several of these claims were previously asserted in the Plaintiffs' first amended complaint, but, in the second amended complaint, Plaintiffs assert the RICO violations for the first time (*Compare* Dkt. #9, *with* Dkt. #80).

In short, Plaintiffs allege that Morris and other Gateway leaders represented that "15% of all tithe dollars would be distributed to global missions and Jewish ministry partners," encouraging Plaintiffs to give generously toward these ends (Dkt. #80 at ¶ 9). In addition to these specific

---

[1]  Plaintiffs assert the following in their second amended complaint: "Defendant Steve Dulin is an individual residing in Tarrant County, Texas, and has been served with process at and made his appearance herein" (Dkt. #80 at ¶ 49). Despite this representation, the Court is not aware that summons were returned executed as to Dulin. Specifically, Plaintiffs did not file a proof of service for Dulin, and Dulin has not appeared in this proceeding.

charitable purposes, Plaintiffs also contend, albeit inconsistently, that Defendants represented their tithe dollars would be allocated as follows:

1. "15% of all tithes go to Global Ministries" (Dkt. #80 at ¶ 18);

2. "15% of all tithe dollars went to global missions work via Gateway Global Ministries" (Dkt. #80 at ¶ 19);

3. "[Morris] promised that of the tithing dollars funneled to missions, the first 10% went to 'Jewish ministries'" (Dkt. #80 at ¶ 20);

4. "[T]he Gateway site states that '[t]he first 15% of Gateway's tithe is set aside to support local, national, and international outreach efforts'" (Dkt. #80 at ¶ 21);

5. "15% of church tithing dollars would go to international missions and Jewish ministries" (Dkt. #80 at ¶ 66); and

6. "Plaintiffs agreed to tithe in exchange for the promise that at least 15% of those monies would go to international mission efforts and Jewish ministries" (Dkt. #80 at ¶ 77).

Plaintiffs allege Defendants made these representations through various mediums: during sermons, in the "Members' Handbook," at conferences, and on Gateway's website (Dkt. #80 at ¶¶ 16, 19–22). But according to Plaintiffs, Defendants did not allocate these funds as represented. Instead, Plaintiffs contend Defendants "have diverted money from global missions and Jewish ministry partners to 'secret organizations'" (Dkt. #80 at ¶ 9). Plaintiffs do not specify what these organizations are.

Finally, Plaintiffs allege that Defendants previously guaranteed they would return their tithe dollars if they wanted such a return (Dkt. #80 at ¶ 10). Plaintiffs contend that Defendants have refused to do so. Instead, Plaintiffs assert that when they asked for the return of their tithes, they were told the following:

> [Gateway]'s general position is that it is impermissible for [Gateway] to refund or return donations. . . . Unlike a deposit in a bank, donated funds are not kept on account for the donor but, when received, immediately made part of other donated

3

funds and used for [Gateway]'s many *charitable purposes*. Refunds are not a charitable purpose.

(Dkt. #80 at ¶ 40 (emphasis added)).

## B.    Procedural Background

Following the filing of the second amended complaint, Defendants filed the instant motions before the Court—Gateway's motion to dismiss (Dkt. #83), Gateway's motion to stay discovery (Dkt. #84), Morris's partial motion to dismiss (Dkt. #85), and Morris's motion to strike class allegations (Dkt. #87). The Motions have been fully briefed (Dkt. #90; Dkt. #92; Dkt. #93; Dkt. #94; Dkt. #98; Dkt. #99; Dkt. #100).[2] The Motions are now ripe for adjudication.

## LEGAL STANDARD

### I.    Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) authorizes dismissal of a case for lack of subject matter jurisdiction when the district court does not have statutory and constitutional power to adjudicate the case. *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). If a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the Court will consider the jurisdictional attack under Rule 12(b)(1) before addressing any attack on the legal merits. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

In deciding the motion, the Court may consider "(1) the complaint alone; (2) the complaint supplemented by the undisputed facts evidenced in the record; or (3) the complaint supplemented

---

[2] The Court notes that Morris adopted and incorporated by reference Gateway's motion to dismiss, thereby asserting the same grounds for dismissal in his own motion, including Gateway's arguments that the ecclesiastical abstention doctrine and CAFA's "home state exception" require dismissal (Dkt. #85 at p. 19). Plaintiffs filed combined objections and responses in opposition to Gateway's motion to dismiss and Morris's partial motion to dismiss (Dkt. #93). Thus, the Court will treat the arguments in Gateway's motion to dismiss as Defendants' collective arguments urging the Court to dismiss Plaintiffs' claims.

by undisputed facts plus the [C]ourt's resolution of disputed facts." *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008) (internal quotation marks omitted) (quoting *Barrera-Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996)). The Court will accept as true all well-pleaded allegations set forth in the complaint and construe those allegations in the light most favorable to the plaintiff. *Truman v. United States*, 26 F.3d 592, 594 (5th Cir. 1994). Once a defendant files a motion to dismiss under Rule 12(b)(1) and challenges jurisdiction, the party invoking jurisdiction has the burden to establish subject matter jurisdiction. *See Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980). The Court will grant a motion to dismiss for lack of subject matter jurisdiction only if it appears certain that the claimant cannot prove a plausible set of facts to support a claim that would entitle it to relief. *Lane*, 529 F.3d at 557.

## II.    Rule 12(b)(6)

The Federal Rules of Civil Procedure require that each claim in a complaint include a "short and plain statement . . . showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Each claim must include enough factual allegations "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

A Rule 12(b)(6) motion allows a party to move for dismissal of an action when the complaint fails to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). When considering a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded facts in the plaintiff's complaint and view those facts in the light most favorable to the plaintiff. *Bowlby v. City of Aberdeen,* 681 F.3d 215, 219 (5th Cir. 2012). The Court may consider "the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). The Court must then determine whether the

complaint states a claim for relief that is plausible on its face. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "But where the well-pleaded facts do not permit the [C]ourt to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting FED. R. CIV. P. 8(a)(2)).

In *Iqbal*, the Supreme Court established a two-step approach for assessing the sufficiency of a complaint in the context of a Rule 12(b)(6) motion. First, the Court should identify and disregard conclusory allegations, for they are "not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 664. Second, the Court "consider[s] the factual allegations in [the complaint] to determine if they plausibly suggest an entitlement to relief." *Id.* "This standard 'simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of' the necessary claims or elements." *In re S. Scrap Material Co.*, LLC, 541 F.3d 584, 587 (5th Cir. 2008) (quoting *Twombly*, 550 U.S. at 556). This evaluation will "be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).

## ANALYSIS

The Court begins with Gateway's motion to dismiss, which Morris joins (Dkt. #83; Dkt. #85 at p. 19). Defendants urge the Court to dismiss Plaintiffs' second amended complaint for the following reasons: (1) the ecclesiastical abstention doctrine precludes this lawsuit; (2) Plaintiffs' claims under RICO and CAFA fail to invoke the Court's jurisdiction; (3) Plaintiffs' fraud claims

should be dismissed under Rule 12(b)(6) and Rule 9(b); and (4) Plaintiffs' breach of contract claims should be dismissed under Rule 12(b)(6) (Dkt. #83 at pp. 10–12). The Court will first address the ecclesiastical abstention doctrine, also known as the religious or church autonomy doctrine.[3] Ultimately, the Court finds that the ecclesiastical abstention doctrine is dispositive under Fifth Circuit precedent.

The Court previously addressed Defendants' reliance on the ecclesiastical abstention doctrine as a basis for dismissal in the September 17 Order (Dkt. #77 at pp. 10–13). In that order, the Court denied Defendants' previous motion to dismiss without prejudice, finding that, at that point, the claims in Plaintiffs' first amended complaint implicated non-religious conduct, such as Defendants' "acts of concealment; discrepancies in the reconciliation of donated funds balances; unaccounted for donations; financial irregularities; and lack of transparency or substantiations for Gateway's use of Plaintiffs' donations" (Dkt. #77 at p. 13). Thus, the Court held that Plaintiffs' claims were not barred by the ecclesiastical abstention doctrine, reasoning that the first amended complaint asked the Court "to apply neutral principles of Texas law," making the lawsuit "a civil rather than religious dispute" (Dkt. #77 at p. 13).

Looking now at the second amended complaint, Plaintiffs' only new claims are RICO violations (*Compare* Dkt. #9, *with* Dkt. #80). So, as to Defendants' ecclesiastical abstention doctrine argument, the instant motion to dismiss Plaintiffs' second amended complaint is, in

---

[3] Defendants argue that under Fifth Circuit precedent, the issue of whether the ecclesiastical abstention doctrine applies "must be resolved at the threshold of litigation" and is subject to "immediate interlocutory appeal" if denied (Dkt. #83 at p. 10). The Court agrees. *McRaney v. N. Am. Mission Bd. of the S. Baptist Conv., Inc.*, 157 F.4th 627, 641, 647 (5th Cir. 2025), ("[T]he church autonomy doctrine has numerous features of a jurisdictional bar. It limits the powers of federal courts. It immunizes ecclesiastical organizations from suit, not just liability. And, when it is denied, it gives rise to an immediate appeal."), *cert. denied*, 224 L. Ed. 2d 16 (Feb. 23, 2026).

essence, a motion for the Court to reconsider its application of the doctrine. Defendants acknowledge this and begin their motion to dismiss by arguing the following:

> Plaintiffs' claims must be dismissed for a preliminary and fundamental reason: they would intrude upon Gateway's religious freedom and autonomy as a church and are therefore barred by the First Amendment's ecclesiastical abstention doctrine. While the Court previously analyzed ecclesiastical abstention in its Opinion, the necessity of dismissal is now inescapable in light of the Fifth Circuit's recent landmark opinion in *McRaney.*

(Dkt. #83 at p. 15).

*McRaney* was originally issued on September 9, 2025—months after the parties had completed their briefing and days before the Court issued its September 17 Order. *See McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.*, 155 F.4th 415 (5th Cir. 2025), *withdrawn and superseded by* 157 F.4th 627 (5th Cir. 2025), *cert. denied*, 224 L. Ed. 2d 16 (Feb. 23, 2026). On its own motion, the Fifth Circuit withdrew that opinion and substituted another opinion on October 28, 2025. *McRaney*, 157 F.4th at 631.

The Court agrees that *McRaney* must inform its analysis this time around. *McRaney* is binding on the Court and the Fifth Circuit has put it simply: "[c]ivil courts cannot adjudicate ecclesiastical matters." 157 F.4th at 633; *see also Lutheran Church-Missouri Synod v. Christian*, No. 25-50130, 2026 WL 1597600, at *1 (5th Cir. June 4, 2026) ("Unfortunately, litigation within a church is sometimes unavoidable. In such cases, however, the courts of this country are infused with a history of religious tolerance and are guided more specifically by the First Amendment to interfere as little as possible in the affairs that constitute governance of ecclesiastical bodies." (citing *McRaney*, 157 F.4th at 633–34)). Thus, the issue before the Court is whether it appears that the resolution of Plaintiffs' claims will require the Court to adjudicate ecclesiastical matters.

Under the ecclesiastical abstention doctrine, "[t]he 'general principle of church autonomy' guarantees to religious institutions 'independence in matters of faith and doctrine and in closely linked matters of internal government.'" *McRaney*, 157 F.4th at 635 (quoting *Our Lady of Guadalupe School v. Morrissey-Berru*, 591 U.S. 732, 747 (2020)). Specifically, the doctrine, "a corollary of the First Amendment, protects religious institutions' internal management decisions and doctrinal self-governance from judicial intrusion." *Christian*, 2026 WL 1597600, at *4 (citing *McRaney*, 157 F.4th at 635–36). "The doctrine does not grant 'religious institutions . . . a general immunity from secular laws.'" *McRaney*, 157 F.4th at 635–36 (quoting *Our Lady of Guadalupe School*, 591 U.S. at 746). But "its purpose includes safeguarding religious institutions' autonomy with respect to internal management decisions that are essential to the institution's central mission." *Id.* at 636 (citation modified).

Defendants make two broad arguments as to why Plaintiffs' second amended complaint contravenes Fifth Circuit precedent on the ecclesiastical abstention doctrine (Dkt. #83 at p. 10). First, Defendants argue that in *McRaney*, "the Fifth Circuit delineated the broad scope of the ecclesiastical abstention doctrine, including its protection against claims such as Plaintiffs' that challenge a church's funding decisions and sermons by church leaders regarding religious doctrine and practice" (Dkt. #83 at p. 10). Second, Defendants argue that "*McRaney* also confirmed that plaintiffs cannot evade the doctrine by pleading facially neutral legal claims—if the lawsuit touches on inherently religious practices (like tithing) or intrudes on matters of religious governance (like tithing expenditures), then dismissal is required" (Dkt. #83 at p. 10). Defendants often intermingle their arguments, but the Court considers each in turn.

To clarify the "wide-ranging scope" of the ecclesiastical abstention doctrine, the Fifth Circuit identified the following areas where judicial interference is "barred," noting that these categories are not meant to be exclusive:

> (a) the selection and dismissal of clergy and faith leaders (the so-called "ministerial exception"); (b) the meaning of religious beliefs and doctrines; (c) the determination of religious polity, such as membership, matters of discipline and good standing, and the identification of the "true church" amidst internecine disputes; and (d) internal church communications regarding any of the aforementioned activities.

*McRaney*, 157 F.4th at 636.

With respect to second category of the ecclesiastical abstention doctrine outlined above, that civil courts are forbidden from deciding religious questions, the Fifth Circuit highlighted *Harris v. Matthews*, 643 S.E.2d 566 (N.C. 2007). *McRaney*, 157 F.4th at 638. In *Harris*, the Supreme Court of North Carolina "address[ed] whether the restraints of the First Amendment of the United States Constitution, as applied to the states through the Fourteenth Amendment, preclude[d] judicial intervention in [an] *internal church controversy*." 643 S.E.2d at 567 (emphasis added). In *Harris*, church members brought claims for conversion of funds, breach of fiduciary duty, and civil conspiracy against the church's pastor, secretary, and chairman of the board of trustees. 643 S.E.2d at 568. The church members alleged that the defendants misappropriated church funds when they transferred the church's assets to a nonprofit organization as a part of the church's organizational restructuring. *Id.* In holding that it could not adjudicate the claims, the Supreme Court of North Carolina reasoned as follows:

> Determining whether actions, including expenditures, by a church's pastor, secretary, and chairman of the Board of Trustees were proper requires an examination of the church's view of the role of the pastor, staff, and church leaders, their authority and compensation, and church management. Because a church's religious doctrine and practice affect its understanding of each of these concepts,

seeking a court's review of the matters presented here is no different than asking a court to determine whether a particular church's grounds for membership are spiritually or doctrinally correct or whether a church's charitable pursuits accord with the congregation's beliefs.

*Id.* at 571.

In analyzing *Harris*, the Fifth Circuit explained that "[i]t did not matter that the underlying claims—misappropriation of funds and breach of fiduciary duty—were the types of claims that civil courts adjudicate all the time. What mattered was that the plaintiffs wanted North Carolina's courts to apply those civil legal rules to a matter of 'religious doctrine.'" *McRaney*, 157 F.4th at 638 (quoting *Harris*, 643 S.E.2d at 571).

With this understanding, the Court turns to the second amended complaint. At its core, like in *Harris*, the instant lawsuit is an "internal church controversy." 643 S.E.2d at 567. In this case, Plaintiffs identify the two Defendants now moving to dismiss their claims: (1) Gateway, a Texas nonprofit religious organization and one of the largest nondenominational churches in the United States (Dkt. #80 at ¶¶ 3, 47); and (2) Morris, Gateway's founder and former Senior Pastor (Dkt. #80 at ¶¶ 19, 48). Plaintiffs allege that Defendants represented or promised that "15% of all tithe dollars would be distributed to global missions and Jewish ministry partners," inducing Plaintiffs to give generously toward these ends (Dkt. #80 at ¶¶ 9, 66). As noted above, Plaintiffs contend that Defendants made these representations through various mediums, including during sermons, in the "Members' Handbook," at conferences, and on Gateway's website (Dkt. #80 at ¶¶ 16, 19–22). Plaintiffs assert that Defendants did not allocate these funds as they represented that they would (Dkt. #80 at ¶ 9). Just like the church members did in *Harris*, Plaintiffs argue that Defendants' reallocation of their tithe dollars from "global missions" and "Jewish ministries" to

"secret organizations" or to other "charitable purposes," as Defendants represented, was an *improper* transfer (Dkt. #80 at ¶¶ 9, 17–28, 40).

Plaintiffs further allege they entered into valid and enforceable agreements with Defendants, wherein Gateway agreed to give requesting tithers their money back (Dkt. #80 at ¶ 10). Plaintiffs point to one specific example in which Morris promised the following to Gateway's congregation:

> I've told our church on multiple occasions, I've said to them . . . If you'll try it for one year—if you are not fully satisfied—at the end of that year, I'll give you your money back. With twenty-two years of church, no one has ever asked for their money back.

(Dkt. #80 at ¶ 37).

Based on these and other allegations, Plaintiffs brought this suit against Defendants, asserting tortious, contractual, and statutory claims (Dkt. #80 at ¶¶ 67–89). According to the second amended complaint, Plaintiffs relay what they have been told, that "it is impermissible for the Church to refund or return donations" and the tithe funds were "used for the church's many *charitable purposes*" (Dkt. #80 at ¶ 40 (emphasis added)).

Defendants argue Plaintiffs' second amended complaint forces the Court to apply civil legal rules to an ecclesiastical matter—(1) "Plaintiffs' claims are centered on and necessarily attack Gateway's funding decisions (the use 'of church tithing dollars') based on statements made during sermons," (2) "Plaintiffs' suit necessarily and directly attacks Gateway's decisions on use of tithe funds and would require investigation into how Gateway internally made those decisions," and (3) "Plaintiffs' claims against Gateway necessarily call into question Gateway's decisions and communications on the use of tithe funds—a matter that is both 'inherently religious' and central to church governance" (Dkt. #83 at pp. 17, 20).

12

In their response to the motions to dismiss, Plaintiffs attempt to clarify their allegations in the second amended complaint as follows:

> Plaintiffs' allegations are not a misuse of funds concern that would amount to either mere dissatisfaction or constitute a doctrinal dispute. Plaintiffs instead claim that the [Gateway] and its agents affirmatively *misrepresented the intended use of tithing funds for the purpose of soliciting donations from congregants*. Plaintiffs further allege that the [Gateway] entered into a contract with Plaintiffs regarding the allocation of *particular tithing funds to international mission efforts and Jewish ministries*. In other words, Plaintiffs' dissatisfaction is based on the [Gateway]'s failure to fulfill its representations that could be made in a secular context and are statements that induce tithing.

(Dkt. #93 at pp. 19–20 (emphasis added)).

Gateway replied and argued that "while Plaintiffs focus on how they frame their claims," in *McRaney*, "the Fifth Circuit reasoned that the application of ecclesiastical abstention turns on 'the subject matter' of the dispute (e.g., the use of tithes or statements made in sermons), not on the type of claim the plaintiffs allege (e.g., breach of contract or fraud)" (Dkt. #98 at p. 6). Ultimately, the Fifth Circuit's broad pronouncements in *McRaney*, Defendants' arguments, and Plaintiffs' own clarification of its second amended complaint, convince the Court that that the resolution of Plaintiffs' claims—namely, determining whether Defendants' expenditures of Plaintiff's tithe dollars were *proper*—would require the Court to adjudicate ecclesiastical matters.

The claims at issue will implicitly require the Court to determine the meaning of Plaintiff's references to "global missions," "Jewish ministry partners," "local, national, and international outreach efforts," and other terms that implicate religious beliefs (Dkt. #80 at ¶¶ 9, 17–28). Although the Court agrees with Plaintiffs that, on the face of the second amended complaint, their claims seemingly address Defendants' non-religious conduct, this conduct centers around the allocation of tithing dollars to Gateway's "many charitable purposes" (Dkt. #80 at ¶¶ 28–30, 36,

40, 42). As such, while both parties acknowledge Plaintiffs' claims are grounded in traditional civil law, resolving the claims would require the court to examine the management of Gateway's donated funds, which will "necessarily implicate[] questions of faith, scripture, and religious doctrine." *McRaney*, 157 F.4th at 638.

Specifically, Plaintiffs seem to be asking the Court to rule upon whether their tithe dollars were *properly* allocated to any one of the following categories, as represented by Defendants:

1. "15% of all tithes go to Global Ministries" (Dkt. #80 at ¶ 18);

2. "15% of all tithe dollars went to global missions work via Gateway Global Ministries" (Dkt. #80 at ¶ 19);

3. "[Morris] promised that of the tithing dollars funneled to missions, the first 10% went to 'Jewish ministries'" (Dkt. #80 at ¶ 20);

4. "[T]he Gateway site states that 'The first 15% of Gateway's tithe is set aside to support local, national, and international outreach efforts. Your generosity helps provide resources for ministry partners and people in need around the world'" (Dkt. #80 at ¶ 21);

5. "15% of church tithing dollars would go to international missions and Jewish ministries" (Dkt. #80 at ¶ 66); and

6. "Plaintiffs agreed to tithe in exchange for the promise that at least 15% of those monies would go to international mission efforts and Jewish ministries" (Dkt. #80 at ¶ 77).

Even if Defendants disclosed their expenditures, the Court is barred from determining whether the allocation of funds properly fell into any one of these categories listed above, or whether the reallocation was made for another charitable purpose. Notably, Plaintiffs have not alleged that Morris, Dulin, or any other Gateway leader pocketed their tithe dollars for *personal* gain. Indeed, Plaintiffs have alleged that Defendants diverted their donations to "secret organizations," which Plaintiffs have not defined, and that Defendants maintain that the donated funds were "used for the church's many *charitable purposes*" (Dkt. #80 at ¶ 40 (emphasis added)).

14

In other words, determining whether Gateway diverted money from "Global Missions and Jewish ministry partners" and "local, national, and international outreach efforts," to unspecified "secret organizations" or other "charitable purposes," would require the Court to "determine whether a particular church's policies were 'doctrinally correct' or 'accord[ed] with the congregation's beliefs'" (Dkt. #80 at ¶¶ 9, 17–28). *McRaney*, 157 F.4th at 638 (quoting *Harris*, 643 S.E.2d at 571).

Further, resolving Plaintiffs' claims would require the Court to "evaluat[e] the truth of [a] sermon." *McRaney*, 157 F.4th at 639. Again, Plaintiffs allege Defendants' various misrepresentations and promises were made during sermons, within the "Members' Handbook," at conferences, and through Gateway's website (Dkt. #80 at ¶¶ 16, 19–22). Plaintiffs specifically alleged that two senior pastors promised to give the congregation their money back if they were dissatisfied with how the church used it (Dkt. #80 at ¶ 37). These promises were purportedly made during sermons, but as the Fifth Circuit has stated, "it is not 'in the competence of courts under our constitutional scheme to approve, disapprove, classify, regulate, or in any manner control sermons delivered at religious meetings.'" *McRaney*, 147 F.4th at 639 (quoting *Fowler v. Rhode Island*, 345 U.S. 67, 70 (1953)). Again, this analysis may have been different if Plaintiffs had alleged that Morris, Dulin, or any other Gateway leader reallocated their tithe dollars for personal gain. But this is not the case. Plaintiffs have alleged that Gateway's leaders made certain representations about the allocation of their tithe dollars within religious contexts and that these representations induced Plaintiffs to give generously toward these charitable purposes; specifically, towards global missions and Jewish ministry partners (Dkt. #80 at ¶ 9).

In sum, the Court agrees with Defendants that resolving Plaintiffs' claims will require the Court to conduct an inquiry into the "internal management decisions that are essential to the

institution's central mission"—specifically, whether Gateway has properly allocated its funds from one charitable organization over another—which the Fifth Circuit has forbidden. *McRaney*, 147 F.4th at 636 (citation modified). And, again, determining whether a church's expenditures properly fall into a specific charitable purpose would require the Court to involve itself in internal church controversies by defining Gateway's mission and outreach efforts, which are topics unfit for adjudication. Thus, Plaintiff's claims against Defendants must be dismissed under the ecclesiastical abstention doctrine, as outlined in *McRaney*.

Accordingly, Gateway's motion to dismiss should be granted. Because Morris' motion to dismiss adopted Gateway's arguments, that motion should also be granted. Finally, having found that Plaintiffs' claims are precluded under the First Amendment, the remaining motion to stay discovery and motion to strike class allegations should be denied as moot.

## CONCLUSION

It is therefore **ORDERED** that Gateway Church's Motion to Dismiss Second Amended Complaint for Lack of Subject Matter Jurisdiction and Failure to State a Claim and Brief in support (Dkt. #83) is hereby **GRANTED**.

It is further **ORDERED** that Motion to Stay Discovery Pending Resolution of Gateway's Motion to Dismiss Second Amended Complaint for Lack of Subject Matter Jurisdiction and Failure to State a Claim (Dkt. #84) is hereby **DENIED as moot**.

It is further **ORDERED** that Defendant Robert Morris's Partial Motion to Dismiss and Brief in Support and Motion for Extension of Time to File an Answer (Dkt. #85) is hereby **GRANTED**.

It is further **ORDERED** that Defendant Robert Morris's Motion to Strike Class Allegations and Brief in Support (Dkt. #87) is hereby **DENIED as moot**.

It is further **ORDERED** that Plaintiffs' claims are **DISMISSED** and the Clerk is directed to **CLOSE** this civil action.

**IT IS SO ORDERED.**

**SIGNED this 23rd day of June, 2026.**

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE